O'LEARY v. MICHIGAN STATE TELEPHONE CO.

1. NEGLIGENCE—CHILDREN—TRESPASSERS—ATTRACTIVE DANGERS.
   A child of the age of seven years is not a trespasser, and as such barred of recovery for an injury resulting from his having his hands caught in a pulley block, fastened to a post in the street, and being operated intermittently by a team and men more than a block away.

2. SAME—QUESTION FOR JURY.
   Whether a telephone company, whose servants were engaged in stringing a cable on poles in a street, was negligent in leaving a large pulley block unattended while it was being intermittently operated by a team and men more than a block away, the servants having notice that children were in the vicinity and attracted by the appliances, *held*, properly submitted to the jury.

3. SAME—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.
   Whether a child of the age of seven years was guilty of contributory negligence in meddling with a pulley block, left unattended in the street, while being intermittently operated by a team and men more than a block away, *held*, a question for the jury.

   HOOKER and GRANT JJ., dissenting.

Error to Kent; Wolcott, J. Submitted February 7, 1906. (Docket No. 103.) Decided November 7, 1906.

Case by William F. O'Leary, by next friend, against the Michigan State Telephone Company, for personal injuries. There was judgment for plaintiff, and defendant brings error. Affirmed.

*William E. Thompson* (*Elliott G. Stevenson* and *Leo M. Butzel*, of counsel), for appellant.

*Carroll, Kirwin & Hollway*, for appellee.

BLAIR, J. On the 5th of November, 1904, the plaintiff, who was a child of the age of seven years, was, with other

children, playing in and about Gold street, in the city of Grand Rapids, in front of, and near, his father's house. While so engaged they saw a wagon of the defendant, upon which were a number of employés, turn from Bridge street and drive south on Gold street and stop at a post standing on the west side of the street. The men proceeded to unload and throw upon the ground reels, ropes, snatch blocks, and other equipment, preparing to string a cable on poles standing in Gold street from Bridge street south to Butterworth avenue. This post was adjacent to the sidewalk, and was used as a guy stub or anchor post, to the bottom of which the snatch block was attached. This post stood 50 or 60 feet south of Bridge street, between two and three feet from the sidewalk, and between the sidewalk and the curb. The plaintiff and the other children crossed the street, and, while the men were at work about the guy stub or anchor post, they proceeded to roll the reel upon which had been wound the lead rope, and push it around in the street. They had rolled this reel up by the sidewalk and had been playing with it about 20 minutes, when Mr. McCarthy, one of defendant's employés, came along, took it away from them, and stood it on end by the sidewalk. Mr. McCarthy testified that:

"When we first drove up where the anchor post is there was some children there; they were on the wagon when I first noticed them, around where we were unloading the stuff. The plaintiff in this case was one of them, and there was three or four others. After we had the lead rope up and had taken it off the reel, we started to pull in the cable. When we were stringing out the rope, they were around in our way and under our feet a little, and I told them to keep away from there. At the time I told the children this, they were pulling on the rope first when I told them to keep away, and the next time I told them to get away from there they were rolling the reel around in the road. When I said, 'pulling the rope' I meant the 'reel.'"

Mr. McCarthy further testified that when he started to take the reel away from the children they ran across the

street and stood on the sidewalk and laughed at him. When he said he would get them if he caught them around there, they laughed and seemed to take it as fun. This was before the snatch block was put in place at the bottom of the anchor post, and nothing was said to the plaintiff or the other children at any time after the snatch block was put on the rope, although they were in the street across the way playing about there.

This snatch block was a large appliance eight inches in diameter, made of iron and wood, with a hook fastened to the post. It had one removable side with a clasp to it, and in the center is a large pulley inclosed and encased in the frame. The pulley was on a swivel and the rope passed over the top of the pulley and came out underneath, and to·the end of which was hitched the team. There was thus a circuit of the cable and rope, and as the team moved south on Gold street from the anchor post, the rope passed through the snatch block over the pulley, and thus the cable was elevated upon the cross-arms of the poles and moved to the north as the team moved south. There was no guard or other protection on the snatch block to prevent a person's hand from going into it with the rope, and a hand could go in where the rope would. As the team went south on Gold street, the employés of the defendant took positions on the poles, as it was necessary for a man to be on each pole to free the cable clips that would catch on the cross-arms as the cable moved. Mr. McCarthy went ahead of the team as it went south on Gold street, watching for signals from the men on the poles, and Mr. McCue, another employé, stood on the corner of Gold and Bowery streets, nearly a block from the snatch block and anchor post, to guard that crossing. The latter was the nearest man to the snatch block at the time the plaintiff was injured. Frequent stops were necessary as the cable was being strung, on account of the cable clips catching, though the longest of these stops were about four or five minutes.

While this work was in progress, the snatch block was

left entirely unguarded and unprotected and no one stationed at or near it to warn plaintiff and the other children or any one else of danger; Mr. McCue, the nearest employé to the snatch block, being at the corner of Gold and Bowery streets, a block distant. The pulley in the snatch block revolved rapidly, when the team was in motion, and, the pulley and block being dry, made a squeaking noise as the rope passed around it, which frightened Mr. Timmer's horse and attracted the attention of the plaintiff and his little companion, who were across the street, and they came over to the snatch block to look at the pulley revolving (or, as the plaintiff called it, "the wheel"), the moving rope, and the other strange equipment, and also to see what caused the noise. They reached the snatch block at a time when the team was standing still, and, presumably, during one of the frequent stops caused by the cable clips catching, for at that time the rope was not moving, but standing still, and they began playing with it. Plaintiff, being the larger of the two, had hold of the top rope or the one passing into the snatch block, while the Rybrick child had hold of the rope which moved from the snatch block when the team was in motion. The place where they had hold of the rope was about 18 inches from the snatch block, and, while so playing, the employés of the defendant, without notice or warning to the plaintiff, and, in fact, without paying any attention at all to the snatch block, suddenly started up the team, and, in a short period of time, about as long as it would take the team to travel 18 inches along Gold street or take one step, the plaintiff's hands were drawn into the snatch block and crushed. The trial judge submitted the case to the jury, plaintiff recovered judgment, and defendant appeals to this court.

The defense, at the close of the plaintiff's proofs, at the close of the testimony, and, in this court, relies upon the defense that the case as made by the plaintiff was not sufficient in law to entitle him to have the same submitted

to the jury, but that it was established from the proofs as a matter of law:

(1) That the defendant was not negligent.
(2) That the plaintiff was guilty of contributory negligence.
(3) That the plaintiff was a trespasser.

We shall consider first whether plaintiff was a trespasser, as contended by appellant, citing *Kaumeier* v. *Railway Co.*, 116 Mich. 307 (40 L. R. A. 385); *Ryan* v. *Towar*, 128 Mich. 468 (55 L. R. A. 310), and other cases. We do not think this case is ruled by the cases cited, but that it falls within the principle of *Powers* v. *Harlow*, 53 Mich. 507. That case was not overruled by *Ryan* v. *Towar*, but was distinguished in the majority opinion, the writer saying:

"But in that case the child was not a trespasser on the land whatever may be said of his meddling with the explosives."

The case of *Powers* v. *Harlow* is an authority in this State, and is supported by the great weight of authority in this country and in England. The present case differs from *Kaumeier* v. *Railway Co.* and other cases cited in appellant's brief in that here the owner of the property was present, operating the property, and the plaintiff was where he had a right to be. The plaintiff was in the public highway, where he had as much right to be as defendants employés, and while his laying his hand upon the cable was technically a trespass, it was no more so than taking the exploder cap from the box in the case of *Powers* v. *Harlow*. Plaintiff's mere technical trespass did not set in motion, as in the cases cited, the agencies which caused his injury; those agencies were brought into operation and controlled by defendant's employés. There is reasonable ground for distinction between a case where something is left in the highway which can only injure a child by his meddling with it and putting it into operation in the absence of the owner or person having it in charge

and a case like the present when the owner is present operating the apparatus and has actual notice that the children are attracted by the tackle and will play with it unless prevented.

The questions of negligence and contributory negligence were properly submitted to the jury. The age of the plaintiff has an important bearing upon both questions. Defendant's employés knew that the children were attracted by, and disposed to play with, the apparatus, since they had been playing with the reel which McCarthy had taken away from them, and then chased them across the street. Notwithstanding this, the children came back again.

"*Q.* It was not a part of your duties to watch them or to watch that snatch block, was it?

"*A.* Yes; it was in a way; I was supposed to look for trouble of any kind that was there.

"*Q.* You would not very well do that when facing the other way and looking for the work ahead of you?

"*A.* Of course, after we got started pulling, then I was supposed to look ahead. * * * I warned Willie to keep away from the reel. I warned him myself once after we got started with the rope, him and another boy. There were two boys with hands on the rope and I told them to keep away from there after they started to string the cable. * * * It was after the team started. The boys were playing on the rope. They were about 28 feet or 30 ahead of the snatch block. They were behind me. They were jumping on the rope a little and I told them to go away, and they went away and that was the last I saw of them. We had started when I warned the boys.

" *Q.* Now, after you started to string this cable, how many times did you have occasion to go back or look around towards the snatch block before you got to Bowery street?

" *A.* I did not go back at all when I looked around. When I first warned him, Willie went away and I did not see him until he got 'catched.' I told him to keep away and they went away the time they were told. I had in mind the danger of a break in the rope, as the rope breaks once in a while and there is danger if there is anybody on it. I did not direct their attention in any way to

the block or the danger of the block. I never saw them near the block. They were on the rope."

It was for the jury to say whether, under the circumstances, the defendant's employés were not negligent in leaving the block unguarded and in not giving the children a proper warning of the danger of playing with the rope and in taking no precautions to ascertain whether the children had returned. It was also for the jury to say whether the plaintiff had sufficient warning of or sufficient understanding of the danger to render him guilty of contributory negligence.

The judgment is affirmed.

Carpenter, C. J., and McAlvay, Montgomery, Ostrander, and Moore, JJ., concurred with Blair, J.

Hooker, J. (*dissenting*). The judgment rendered in this action was in favor of an infant, who, at the time of the injury for which he sued, was seven years of age. The defendant's construction gang was engaged in stringing a trolley wire, using a block or pulley, through which a rope ran, when the wire was being drawn forward, the power being applied by a team attached to the end of the rope, the team, at the time of the accident, being some distance from the block. The child meddled with the rope, and his hand was drawn into the block and crushed. Three important questions are raised:

(1) Was it negligence on the part of the defendant to use this apparatus without stationing a guard at the block to prevent intermeddling by children?
(2) Was the child a trespasser in meddling with the rope and block, and therefore not entitled to recover?
(3) Was the child guilty of contributory negligence?

It is contended by the defendant's counsel, that the undisputed testimony entitled him to a verdict by direction of the court upon each and all of said grounds. We understand that the defendant's right to use the appliances referred to on the highway is not disputed, and, on the other hand, no question seems to have been made over the

plaintiff's right to use the street for a place to play, and the controversy is narrowed to the question raised in the "*Turntable Cases*," viz., must one using the highway for lawful purposes take into consideration the propensities of mankind to meddle, and exercise increased diligence to prevent injury to such intermeddlers with his property? There is nothing in the record to indicate that the appliance would have injured any one but a meddler, and an adult plaintiff who should have done what this plaintiff did, would, if injured, have been denied relief, upon the ground that he was a trespasser. This proposition is elementary and needs no amplification. At the furthest, only ordinary care is due a trespasser.

The plaintiff's counsel contend, however, that the fact that this was a place frequented by children (as all city streets are) made it a duty of the defendant to take extraordinary care to prevent, not an injury from the appliance itself, or its proper use, but an injury from intermeddling with it, by the injured party, and, as usual in such cases, the claim is rested upon the theory that, the appliance being one naturally attractive to children, there was an implied license to them to meddle with it, or, if not that, at least there was a duty on the part of the owner to station a guard to prevent intermeddling by children. It may be safely conceded that children would be likely to be attracted by any object that is being used, or that had been left in the highway, but we should be slow to conclude that the multitude of things that are so used or left in the highway must always be guarded. The time will probably never come when children will cease climbing upon wagons, catching upon bob sleds, and examining and handling any and all machinery which they can approach, or getting dangerously near to horses and other animals left in the street. It has never been the rule, however, that a driver cannot leave his team, or must reduce its pace to a walk, lest some boy get hurt through intermeddling with it, and it would be a great hardship if owners were compelled to forego the leaving of a horse at the

curb, or provide a guard.   Yet we are asked to say that
this defendant should have stationed a guard to perform
the duty which the parent owes.   That there are some
cases from which such a claim is a logical deduction can-
not be denied, and of these the " *Turntable Cases*," so
called, are the principal ones.   Eliminate those cases, and a
few others based upon them, and there will be little sup-
port for the claim left.   This subject has been discussed
in *Ryan* v. *Towar*, 128 Mich. 463 (55 L. R. A. 310), where
we endeavored to show the fallacy of the reasoning of the
" *Turntable Cases*," and distinctly declined to follow the
rule laid down in them.   We there cited several cases in
which courts of the older States had refused to follow the
rule, and since that decision was made several others have
done so.

Counsel, however, urge that we recognize an alleged
distinction between *Ryan* v. *Towar* and the present
case.   They say that *Ryan* v. *Towar* was a case where
the injury occurred on private premises, and not upon a
highway, and they also insist that the fact that this or
other boys had been seen in the vicinity by defendant's
servants made vigilance a duty.   We are of the opinion
that one who meddles with the appliances of another in
the highway is a trespasser as much as one who does it
elsewhere, and, if an injury results by reason of the tres-
pass, he is remediless in either case.   That is the doctrine
in this State under repeated decisions, most of which will
be found cited in the *Towar Case*.   *Hargreaves* v. *Dea-
con*, 25 Mich. 1, announces the doctrine as to real estate,
where Mr. Justice CAMPBELL said:

" If, for example, a grown person coming upon the
premises simply by the permission of the occupants had
fallen into this cistern without any negligence, by stepping
where there was no apparent danger, he would in law
have stood just where this child did.   The injury might
have happened, as in *Fisher* v. *Thirkell*, 21 Mich. 1,
from the insecurity of an apparently safe covering.   We
have searched diligently, and perhaps a little anxiously,
to find legal support for a distinction, but there is no

foundation for any in law, and we think there is none in any reason which should govern the action of courts of justice."

See *Grunst* v. *Railway Co.*, 109 Mich. 345, where the language of Mr. Justice CAMPBELL is quoted with approval by Mr. Justice MONTGOMERY. *Bledsoe* v. *Railway Co.*, 126 Mich. 315; *Formall* v. *Standard Oil Co.*, 127 Mich. 496. These cases and others sustain the doctrine that a trespasser cannot require diligence upon the part of the person upon whose property he trespasses. In *Kaumeier* v. *Railway Co.*, 116 Mich. 307 (40 L. R. A. 385), we applied the rule to a case where a car was left on a switch, without blocking, in a public highway, and held that the plaintiff was a trespasser in attempting to use the car.

It is unnecessary to hold in this cause that in no case can a trespasser recover for an injury, and there may be cases where the presence and conduct of children, known to a defendant, may call for a warning and perhaps more. Upon that question we express no opinion further than to say that the evidence in this case does not warrant such a conclusion. There is no evidence of negligence of any duty owing to this plaintiff. In *Holbrook* v. *Aldrich*, 168 Mass. 15, it was said by Mr. Justice Holmes in a case where a child, while in a shop with her father who was making a purchase, meddled with, and was hurt in, a coffee mill therein:

"We are of opinion that the direction was right. If the decision were to be put on the narrowest possible ground, it might be said that, at the moment of the accident, the plaintiff was not within the scope of the defendants' implied invitation, and therefore was entitled to no protection against such possibilities of harm to herself. But even if she had been buying coffee, we should regard the rule as the same. The defendants' invitation in that case would have bound them to due care for the safety of those walking in the neighborhood while simply moving about. But it would not have bound them to look out for, or to prevent, wrongful acts, on the ground

that the acts, if done, might hurt the actor. Temptation is not always invitation. As the common law is understood by the most competent authorities, it does not excuse a trespass because there is a temptation to commit it, or hold property owners bound to contemplate the infraction of property rights because the temptation to untrained minds to infringe them might have been foreseen. *McEachern* v. *Railroad Co.*, 150 Mass. 515; *Daniels* v. *Railroad Co.*, 154 Mass. 349 (13 L. R. A. 248); *Gay* v. *Railway Co.*, 159 Mass. 238 (21 L. R. A. 448). The case is similar in principle to *McGuiness* v. *Butler*, 159 Mass. 233, and to *Mangan* v. *Atterton*, L. R. 1 Exch. 239, which, notwithstanding the observations in *Clark* v. *Chambers*, L. R. 3 Q. B. Div. 327, has been cited in this Commonwealth repeatedly as unquestioned law. See, also, *Hughes* v. *Macfie*, 2 Hurl. & C. 744. In *Moynihan* v. *Whidden*, 143 Mass. 287, which would have to yield to *McGuiness* v. *Butler*, if there were a conflict, it seems to have been assumed that the plaintiff's touching the rope was not tortious."

See, also, *Friedman* v. *Snare & Triest Co.*, 71 N. J. Law, 605 (70 L. R. A. 147). In this case a girl playing upon iron girders carelessly piled was crushed by their fall. The court said:

"And further, an individual member of the public, if specially damnified by the nuisance while in the exercise of his rights in the street, may maintain a private action. But this refers only to parties injured while using the street as a street, and not to those whose injuries arise from their attempted use of the obstructing materials for their own purposes, whether of pleasure, convenience, or profit. For the building materials themselves do not in any sense become public property by being allowed to remain in the street. And neither a traveler, nor an idler, nor even a playful child, can gain rights against the landowner, or against his agent who stands in his rights, by using such building materials as a resting place or playground. In the absence of circumstances denoting invitation, one thus using the private property of another for his own purposes may be either a licensee or a mere trespasser, depending upon circumstances. In neither case is there any duty incumbent upon the proprietor to make his property safe for such use. Aside from the notion that temptation is equivalent to invitation, with which we cannot

concur, there is nothing in the mere existence of building materials as an obstruction in the street that denotes an invitation to the passerby or to the idler or playful child to use the materials for his own purposes. The doctrine of invitation relates to the entry upon, or user of, lands. The very fact that materials piled upon the ground constitute a hindrance to travel negatives the idea of invitation in the ordinary sense.

"The case for the plaintiff rests upon the theory that since these girders were so arranged as to be attractive to children, and since the injured child, with her companions, was using them as a place for play, or as a resting place during or after play, the proprietors of the premises, or the defendants, upon whom, as independent contractors, the matter had been devolved, owed a duty to the children to so arrange the girders as to render them safe for their use. With this view we do not agree.

"No doubt, where a duty exists to take care with respect to the safety of children of tender years, their very age must be taken into account, so that what might be reasonable care with respect to the safety of adults, who are capable to some extent of looking out for themselves, might not be reasonable care with respect to children. But in the present case the very question is whether any duty existed, and we are not able to see that the age of the child is pertinent upon this inquiry. That the party injured in this case was less than five years of age did not at all tend to give her any property interest or right of user in the defendant's girders. Whether she used them as licensee or as trespasser, in either case there was no duty upon the owner to exercise active care with respect to her safety.

"The fact that a dangerous place or object is attractive to children of tender years is legitimately significant where the question of their own want of care is raised. But there are fundamental, and, as we think, insuperable, difficulties standing in the way of adopting the rule that the mere attractiveness of private property gives to the person attracted rights against the owner. One difficulty is that the rule pro tanto ignores the distinction between meum and teum. And on what principle is it to be limited to cases of trespass? Why does it not apply equally to the conversion of personal property, or even to larceny? If those who temporarily and for limited purposes convert the private property of their neighbors to their own use

are to be not only excused, but justified, where by reason of their tender years they were tempted to the trespass, and at the same time are to have rights of action against the true owners for the failure to exercise care about rendering the property suitable for their use, why may not those who, under similar temptation, convert the property of others wholly to their own use be likewise justified, and, instead of a right of action, gain a complete title to the property by simply appropriating it?

"Another and a very practical difficulty that confronts the attempt to lay down any legal rule that depends for its limitatons upon the attractiveness of objects to children of tender years lies in the extreme improbability that any man, however prudent, will be able to foresee what may or may not be attractive to children. Certainly, if a pile of steel girders, each weighing 1,000 pounds, deposited in the street as the girders in the present case were deposited, must be foreseen by a prudent man to be attractive to children, we are unable to say what object may not be thus attractive.

"These are the views which we entertain after a careful consideration of the question at issue in this case, after most learned and able arguments by counsel on both sides, and a review of numerous reported decisions touching more or less closely upon the point."

This case points out the distinction of the question of attractiveness, as bearing upon defendant's negligence, and the plaintiff's contributory negligence, which has been lost sight of in many cases. The learned judge continues:

"The rule laid down in these cases is, as we think, wholly inconsistent with the asserted liability of the present defendant. That rule draws a clear distinction between temptation and invitation, and is, to the effect that those who enter upon private property for their own purposes without invitation, but as trespassers or licensees, do so at their own peril, so far as any right on their part to call for active care on the part of the property owner for their welfare is concerned, and that although the injured party be an infant of tender years, and for that reason less able to care for its own safety, and more susceptible to the attractions that private property affords for purposes of play, this circumstance does not create a duty

where none otherwise would exist. It is true that, in our *Turntable Cases*, the attractive objects were not within the limits of the public highway; but it is likewise true that, in the present case, as already pointed out, while the building materials were within the street, they were deposited there as private property for lawful purposes by the defendant, in the exercise of the landowner's rights in that behalf. And, although the representatives of the public might complain of the occupancy of a portion of the street by building materials, if unreasonably prolonged, or if the materials were insecurely placed, and although any one lawfully using the street as such might have an action if specially injured by collision with the materials, or by their fall if they were negligently left in an insecure position, we cannot see that these circumstances confer rights upon one who is using the building materials as the injured child in the present case was doing."

A late case, written by our Brother OSTRANDER, supports the conclusion reached in this case. See *Stark* v. *Lighting Co.*, 141 Mich. 575 ( 1 L. R. A. [N. S.] 822).

It is unnecessary to discuss the question of contributory negligence.

The judgment should be reversed, with costs of both courts, and no new trial ordered.

GRANT, J., concurred with HOOKER, J.