IAMURRI v. SAGINAW CITY GAS CO.

148    27
150    240

NEGLIGENCE—TRESPASSERS—CHILDREN—ATTRACTIVE DANGERS.

In this case, involving the liability of the owner of a tank wagon containing explosives, for injuries inflicted upon a young child by explosion of the tank while the child was at play thereon, the wagon having been left unattended in the public highway, a judgment for plaintiff is affirmed by a divided court; Chief Justice McALVAY and Justice MONTGOMERY, with whom concur Justices CARPENTER and MOORE, writing for affirmance on the ground that the attractiveness of the wagon to children, and its unguarded situation, constituted an invitation to children to play thereon and excused what would otherwise have been a trespass; and Justices OSTRANDER and HOOKER, with whom concur Justices GRANT and BLAIR, writing for reversal on the ground that the owner of property owes no duty to trespassers except to refrain from willful injury.

Error to Saginaw; Snow, J. Submitted February 16, 1906. (Docket No. 178.) Reargued January 16, 1907. Decided April 30, 1907.

Case by Thomas Nicolas Iamurri, by next friend, against the Saginaw City Gas Company for personal injuries. There was judgment for plaintiff, and defendant brings error. Affirmed by divided court.

*Humphrey, Grant & Smith*, for appellant.

*Weadock, Purcell & Weadock*, for appellee.

McALVAY, C. J. Defendant is a Michigan corporation, located at Saginaw, engaged in the manufacture and sale of illuminating and fuel gas. Plaintiff, by his next friend, recovered a judgment for injuries received by the explosion of a drip wagon used by defendant in and about its business, which had been left upon a street of the city of Saginaw. This drip wagon consisted of a platform

wagon upon which was a boiler, iron or steel tank, 7 feet long and $2\frac{1}{4}$ feet in diameter, extending lengthwise and firmly fastened. On the front end of the wagon, and above the end of the tank, was a seat for the driver. On the top of the tank, $1\frac{1}{2}$ feet back of the seat, was a vent-hole $1\frac{1}{4}$ inches in diameter, closed by the means of a metal plug which screwed into place. At the rear end of the tank was a pump, by means of which the drip or refuse from the sink pots along the gas mains was pumped into the tank. This drip wagon was used by defendant for this purpose. A rubber hose attached to the pump being fastened to the pipe from the drip pot, the drips were pumped into the tank, which when filled was driven to the Saginaw river and emptied. When the tank was being filled the vent was unstopped to allow the air to escape; and when full, it was closed to prevent the drips from splashing out and running down the outside of the tank. This wagon was drawn by one horse. It was the proper and usual appliance for the purpose for which it was used. This work is necessary to keep the gas pipes free from water which may leak into, or become condensed in, the pipes, and also from an oily substance, known as "hydrocarbons," which accumulates in them. In removing the drips a greater or less amount of illuminating gas would necessarily be taken into the tank. Vapors arising from the substances pumped out also are generated in the tank. Neither the gas nor the vapors are explosive in themselves, but when mixed with a proper proportion of air an explosive mixture is formed, and when this mixture is brought in contact with fire in any way an explosion will follow.

On July 7, 1904, an employé of defendant was engaged with this appliance in collecting these drips. When he quit work at night the tank was about one-third filled with drips. As was his custom he drove to the barn, near which the wagon was kept when not in use, intending to continue work the next day. The wagon was left standing in the street near the curb, and the horse put in the

barn of Blank & Baker, who cared for defendant's horses and washed and oiled the wagons. The vent in the top of the tank was left open. Plaintiff, a boy $5\frac{1}{2}$ years old, and a boy companion between 6 and 7 years old, were playing in this street, and after the drip wagon had been left there climbed upon it. Plaintiff climbing upon the seat in front, and the other boy upon one of the hind wheels. An employé of Blank & Baker saw them there, and went out, telling them to get off from the wagon. Plaintiff was too small to get down without assistance, and the man lifted him down and told both of them to keep off from the wagon. Within a few minutes after this man went back into the barn the two boys climbed back on the wagon, plaintiff getting up into the seat in front, and the other boy up the hind wheel and on to the tank, sitting astride of it near the venthole. While they were in this position the tank exploded, the front end being blown out, and the plaintiff was thrown 20 to 25 feet into the air, and fell upon the pavement near the curb about 20 feet south of the wagon. The only evidence in the case as to the cause of the explosion was given by two women, witnesses for defendant, who were sitting in the doorway of a house a short distance south of the wagon, and another witness for defendant, a man on the sidewalk across the street. One of the women testified that she saw the larger boy when he was sitting on top of the tank light a match and drop it into the venthole. The man testified that he saw this boy lean over and look into the venthole; that he raised his hand up to the venthole, and as he did so the explosion occurred. The other woman testified substantially the same as the man. Both women testified that he was using matches on the street shortly before this occurrence. This boy denied that he had matches, or that he put any match in the venthole. Plaintiff was seriously injured. Besides severe bruises, his arm was broken, and it is claimed that a hernia resulted from the injuries. Defendant asks this court to reverse the judgment for several reasons. We

will consider the assignments of error which defendant discusses.

The court allowed plaintiff to introduce in evidence an ordinance of the city of Saginaw to show that the drip wagon was left in the street in violation of its provisions. This is alleged as error, for the reason that the violation of the ordinance was not the direct or proximate cause of the injury to plaintiff. The ordinance prohibits leaving any wagons or vehicles in the public streets when not in actual use. It was material as bearing upon the question of the negligence of defendant. *Flater* v. *Fey*, 70 Mich. 644; *Haines* v. *Railway*, 129 Mich. 475; *Binford* v. *Johnston*, 82 Ind. 426. In the declaration the violation of the ordinance is not counted upon as ground for the action, but it alleges that under the terms of said ordinance, and under the law, it was the duty of defendant, when the wagon was not in use, to remove it from the public streets, and that defendant, disregarding the provisions of the ordinance and its said duty, negligently left its drip wagon in the public street. It was not error to allow this ordinance in evidence.

The next 23 assignments of error in their order and which are discussed, relate to questions allowed on the cross-examination of defendant's witnesses Jane Truckey and Eloda Dunn and the refusal to strike out the answers thereto. These were the witnesses who testified to the fact that plaintiff's companion threw a lighted match into the venthole of the drip wagon. This was a cross-examination relative to the past history and character of these witnesses for chastity. Such examination, if allowable, was only material as bearing upon their credibility. The extent to which such examination should be permitted is a matter of discretion with the trial judge, with which this court will not interfere, unless there is clear abuse of such discretion. *People* v. *Harrison*, 93 Mich. 594; *Knickerbocker* v. *Worthing*, 138 Mich. 239, and cases cited. While this court might well say in this case, as was said in *Beebe* v. *Knapp*, 28 Mich. 72, that the

court below would have wisely exercised its discretion in excluding some of this examination, yet, on account of the latitude of discretion allowed on cross-examination as to the past life and conduct of a witness, it cannot say as a matter of law that it was error to permit it.

Several errors are assigned upon cross-examination of defendant's expert witness W. H. Barthold, a consulting engineer in the employment of defendant and other gas companies. The witness had testified at length as to the constituent parts of the drips pumped from the service pipes into the tank, as to the vapors it generated, as to the illuminating gas always pumped with it, as to the per cent. of air necessary to make the mixture explosive, and that these materials were always present in the tank, and with sufficient heat and air would always explode. The questions referred to with the answers and the objections were as follows:

"*Q.* When that tank was left in the street with horse detached the proper thing to have done would be to cover that vent in the top of the tank to prevent any possibility of matches or sparks or anything of that kind getting into it? (Objected to as incompetent. It is for the jury. Overruled. Exception.)

"*Q.* When it was one-third full from the drip pots under the pipes? (We object to that as incompetent with the addition.)

"*The Court:* He may answer. (Exception for the defendant.)

"*A.* It should have been closed for the purpose of keeping out matches, yes. * * *

"*Q.* To leave it there to make it safe from an explosion which could blow it up, it should have been closed? (Objected to as incompetent.)

"*The Court:* He may answer. (Exception for defendant.)

"*Q.* That is right, isn't it?

"*A.* It should have been closed to keep out any foreign substances.

"*Q.* Which would explode it.. If it had been closed, even if it was one-third full of these gases and water, fire couldn't have got in, and you wouldn't have had any explosion, would you? (Objected to as incompetent.)

"*The Court:* He may answer. (Exception for defendant.)

"*A.* It could have got in by opening the vent.

"*Q.* But to have it absolutely safe when stored it should be put where the vent is covered up and free from fire and heat which would cause an explosion ?

" *Mr. Humphrey:* I object to that as incompetent.

"*The Court:* He may answer. (Exception for defendant.)

"*A.* To make it absolutely safe we would have to lock it up so nobody could get at it."

It is urged that these questions were incompetent and immaterial because: (1) It was a question for the jury to determine whether sufficient precautions were taken to prevent fire from getting into the tank, and the answers of witness were merely opinions; (2) the questions were immaterial because there was no duty imposed upon defendant to make the tank absolutely safe.

We have given the objections in full from the record, and no objections were made on the ground of immateriality. All of these objections but one were too general, and those will not be considered. The objection at all specific is the first one—that it was incompetent on the ground that it was for the jury to determine. As before stated, this witness was an expert, and thoroughly acquainted with the explosive nature of the contents of this tank. He had testified at length, intelligently, and specifically upon these matters upon which he was being cross-examined. We think it was proper cross-examination, and also proper as showing the knowledge of the witness, with which defendant was chargeable, of the nature of the contents of the tank, and how it could be protected from explosion.

Defendant's contention is that under the undisputed evidence in the case plaintiff was not entitled to recover, and the jury should have been so instructed; that from the proofs in the case it followed, as a matter of law: (1) That defendant was not guilty of any negligence which was the proximate cause of plaintiff's injury; (2)

that plaintiff was a trespasser.   It is an undisputed fact
in the case that the drip wagon was left in the public
street by defendant's agent, and that the venthole was un-
covered.   It is practically admitted that defendant is
chargeable with knowledge of the contents of the tank
and the conditions necessary to render them actively
dangerous.   It cannot be seriously claimed that this
wagon was rightfully in the highway, nor that the facts
show that it was guarded or protected while standing up-
on the highway.   It is true one of the firm which owned
the barn had warned these children to go away and not
to play around there, and on this occasion one of the barn-
men a few minutes before the injury had lifted the plain-
tiff down from the seat of the drip wagon, and told the
boys to go away and keep off from it.   The children had
a right to play on the highway, and this wagon was easily
accessible and attractive to them as they were lawfully
playing upon the highway.   We cannot hold that putting
these children off from the wagon and warning them
away and paying no further attention to them amounted
to properly guarding and protecting this property.   It was
negligence on the part of the plaintiff to leave this wagon
in this manner in the public highway.

It is contended that plaintiff in this case was a trespasser
and cannot recover—citing *Ryan* v. *Towar*, 128 Mich. 463
(55 L. R. A. 310), and *Kaumeier* v. *Railway*, 116 Mich.
306 (40 L. R. A. 385).   *Ryan* v. *Towar*, which holds that
one is under no obligation of care toward a trespasser
upon his land, is not, in our opinion, applicable to this
case, where defendant negligently left this drip tank
standing in a public highway.   The following quotation
from Wharton on Negligence (2d Ed.), § 112, is, in our
judgment, applicable:

"It is negligence to leave such an instrument on a place
of public access, where persons are expected to be con-
stantly passing and repassing, and where such persons are
not required to be on their guard, or where children are

accustomed to play; but it is not negligence to leave such an instrument in a private enclosure, which, from its very privacy, excludes the public, and puts on their guard all who enter."

See, also, *Busse* v. *Rogers*, 120 Wis. 443 (64 L. R. A. 183). The *Kaumeier Case* is easily distinguished. Plaintiff was denied the right to recover there, not because she was a trespasser, but because there was no evidence of defendant's negligence. In this case it is clear there was evidence of defendant's negligence. The question is whether that negligence is the proximate cause of plaintiff's injury. I am of the opinion that the correct rule by which this is to be determined is the first one stated in *Skinn* v. *Reutter*, 135 Mich. 57 (63 L. R. A. 743):

"The wrongdoer is responsible for all consequences naturally resulting from his wrong, whether he could have anticipated those consequences or not."

The question then is whether the injury to plaintiff was a natural—not an anticipated—consequence of defendant's wrong. When a particular consequence results from a wrong, it may be said that the wrong is the proximate cause of that consequence, unless there intervenes between the wrong and said consequence something which may properly be denominated a cause. If such cause intervenes, it may be said that the wrong of the defendant is too remote to be made the basis of an action. It is in such case a condition, and not a cause. See *Lewis* v. *Railway Co.*, 54 Mich. 55; *Michigan Cent. R. Co.* v. *Burrows*, 33 Mich. 6; *McLane, Swift & Co.* v. *Elevator Co.*, 136 Mich. 664. What is there in this case intervening between defendant's wrong and plaintiff's injury which may be called a cause? Nothing, unless it be the action of plaintiff's companion, a child of tender years. It is true that the intervention of a responsible human agency has frequently been held to destroy the causal connection between a wrong and its consequences; but the intervening human agency in this case was irresponsible.

"Neither an idiot nor a maniac can be a juridical cause, and the same reasoning applies to persons so young and inexperienced as to be unable to exercise intelligent choice as to the subject-matter." Wharton on Negligence (2d Ed.), § 88.

It may also be said that the intervention of human agency—at any rate, unless that intervention is a wrongful intervention—does not exempt a wrongdoer for the consequences, where his wrong is one imminently dangerous to human life, and we cannot say that the wrong in this case was not one imminently dangerous to human life. Skinn v. Reutter, 135 Mich. 57; Thomas v. Winchester, 6 N. Y. 397. See, also, Harriman v. Railway Co., 45 Ohio St. 11, and cases cited; Binford v. Johnston, 82 Ind. 426; Fishburn v. Railway Co., 127 Iowa, 483, and cases cited.

It was not error to refuse the requests of defendant based upon its theories above indicated, nor to give the charge excepted to, which was in harmony with the views of this court herein expressed.

Another request of defendant was refused which defendant claims should have been given. This request eliminated the question of permanent injury, on the claimed ground that there was no evidence in the case to warrant it. We disagree with defendant upon this proposition. The evidence in the case upon that question warranted its submission to the jury.

The judgment is affirmed.

CARPENTER, MONTGOMERY, and MOORE, JJ., concurred with McALVAY, C. J.

MONTGOMERY, J. I understand this case to present the question whether the owner of property, which in itself is likely to prove attractive to young children and dangerous to them as well, and who leaves it in the public highway accessible to children liable to be induced into using it, where the only trespass which they commit is in the use of the thing itself, is liable for a resulting injury,

or whether he may answer the claim of the child to whom injury has occurred by the statement that before such accident could have happened or injury have been inflicted the child must have been guilty of a technical trespass. It is thought that responsibility has been denied in such cases by *Ryan* v. *Towar*, 128 Mich. 463 (55 L. R. A. 310). I was so unfortunate as to disagree with the majority opinion in *Ryan* v. *Towar*. That circumstance in no way militates against the authority of the majority opinion in that case, and if this question is in fact ruled by that decision, it becomes my duty to bow with submission, and the first inquiry should be whether it is so ruled. It became necessary in *Ryan* v. *Towar* to deal with the previous decisions of this court, and the one the most nearly in point was *Powers* v. *Harlow*, 53 Mich. 507, which was not overruled by the majority opinion. In speaking of *Lynch* v. *Nurdin*, 1 Adol. & E. (N. S.) 29, Mr. Justice HOOKER, in *Ryan* v. *Towar*, said:

"It is noticeable that even the *Lynch Case* did not involve a trespass upon defendant's close, though it did perhaps involve a trespass to personal property."

Then, after discussing the case of *Powers* v. *Harlow*, the opinion, after quoting from the opinion in *Powers* v. *Harlow*, proceeds:

"The court then proceeded to show that the children were rightfully there by invitation, and that some caution was required in such a case. Clearly this does not adopt the rule of *Railroad Co.* v. *Stout*, 17 Wall. (U. S.) 657."

Now, what was meant by the statement in *Powers* v. *Harlow* that the children were rightfully there by invitation? In that case the father of the plaintiff by virtue of a lease of the lands from the defendant was held to have a right of way of necessity across the defendant's farm. In going from the highway to the plaintiff's home the evidence showed that he would pass within a distance of from 1 to 10 rods of a temporary shed in which had been

left a box containing explosives. The plaintiff, who was something over eight years of age, went with his brother two years older to take his father's dinner, and after working at destroying potato bugs for an hour or so moved about at his pleasure in the vicinity of his father's work. The plaintiff looked into the shed, saw the box there partly uncovered, and from the sawdust took out one of the explosives. He was aware of no danger from handling it, and thought no harm in taking it from the open box. After a little he picked up a small stone, and, holding the explosive upon another stone, he struck it with the stone in one hand, while holding it in the other, and with the third blow it exploded, tearing from his left hand the thumb and one finger. Now whatever may be said of the invitation of the child to cross these premises, it is manifest that no invitation was extended to enter this temporary shed or to meddle with the contents of this box. It is directly against the fact to say that they were invited to play with the contents of the box. No such invitation was any more to be implied than was an invitation to any child lawfully in the public street to enter upon the wagon in question in this case and engage in play.

It is noticeable that the duty imposed upon the defendant in the opinion of Chief Justice COOLEY in that case is illustrated by the analogy between a child in a public highway, and one passing across the premises of another as licensee. He says:

"The moving about of the children upon the lands where they were at liberty to go, while they were not actually employed, was as much an incident to their being there as is the loitering or playing by children outside the traveled part of the highway as they go upon it to school or upon errands."

And, in speaking of this shed, he said:

"In this case a shed in which a dangerous explosive was stored was left only partly inclosed, and its structure and location were such as naturally to invite the entrance of children either for play or for shelter from sun and rain.

Children *were rightfully near it*, there was nothing in its appearance to warn them off, it was not fastened against their entrance, and there was nothing about it to indicate that they would do injury or be injured by going there. The box containing the explosives seems to have had more the appearance of a box discarded as of no value and with worthless refuse in it than of a box which it was of the very highest importance should be guarded with sedulous care."

With these facts in the case, it was thought wise and found necessary for Chief Justice Cooley to rest his decision upon the doctrine, which he states as follows:

"Children, wherever they go, must be expected to act upon childish instincts and impulses; and others who are chargeable with a duty of care and caution towards them must calculate upon this, and take precautions accordingly. If they leave exposed to the observation of children anything which would be tempting to them, and which they, in their immature judgment, might naturally suppose they were at liberty to handle or play with, they should expect that liberty to be taken."

The case of *Ryan* v. *Towar* refused to apply this rule, for the reason that the plaintiff in *Ryan* v. *Towar* was a trespasser upon defendant's land. That was the distinction which must have been noted, for *Powers* v. *Harlow* is plainly authority that there is no such immunity to a defendant arising from a technical trespass upon the dangerous thing itself by a child who must be expected to act upon childish instincts and impulses. This step having been taken in *Ryan* v. *Towar*, the result of now holding that a trespass upon the property, which itself furnishes the invitation to a child of immature years, defeats recovery, would result in overruling by piecemeal the case of *Powers* v. *Harlow*, and remove the only basis for distinction recognized by both the majority and minority opinion in *Ryan* v. *Towar*. The case of *Kaumeier* v. *Railway Co.*, 116 Mich. 306 (40 L. R. A. 385), is cited as authority for the proposition that a child who interferes with property in the street is a trespasser and cannot recover. That case was a case of interference with a car

standing upon the track of a street-railway company, and the concluding statement of the opinion was:

" The defendant had just as much right to leave this car where it did as a farmer would have to leave his wagon or carriage upon his own side of the highway, and no one would have the right to move it, except upon the claim that it impeded public travel.    The car being rightfully left where it was upon the track, and not being a thing dangerous in itself, the court should have directed the verdict in favor of the defendant."

But the court in that case distinctly decline to consider and pass upon the doctrine of the *Turntable Cases*, as it was not deemed necessary.    The case of *O'Leary* v. *Telephone Co.*, 146 Mich. 243, was a case in which the court went as far as it was necessary to go for the purpose of deciding that case.    It is not authority against the position which was asserted in *Powers* v. *Harlow*, and maintained in this opinion.

In *Ryan* v. *Towar*, in my dissenting opinion, I stated:

"My Brother HOOKER seems to be of the opinion that even though the use made of property by its owner is likely to result in injury to young children, by attracting them to a dangerous use of the property, yet, if the property be located wholly upon one's own land, so that the child must become a trespasser, in the technical sense, before he can receive injury from the property, the owner may leave it exposed, and will not be liable."

It was in view of this statement that I said: " It is true that neither in *Powers* v. *Harlow* nor *Keating* v. *Railroad Co.*, 97 Mich. 154, were the facts analogous to those in the present case, and for this reason the cases may be distinguished "— a statement which I certainly should not have made had I not understood the opinion of Mr. Justice HOOKER to rest upon the distinct proposition that there was involved in *Ryan* v. *Towar* the necessity for a trespass upon the private lands of the owner.    It did not occur to me then, nor am I now convinced, that the rule laid down by Chief Justice COOLEY that one who leaves exposed to the observation of children anything

which would be tempting to them, and which they in their immature judgment might naturally suppose they were at liberty to handle or play with, is bound to expect that that liberty will be taken, was meant to imply that no duty was owed by the owner of property thus exposed to guard against injury to a child lawfully within reach of such allurement or temptation, and that any claim might be answered by the statement that in doing the very thing which the defendant had wrongfully enticed the immature child into doing, the child was guilty of a trespass which would defeat recovery. Any such qualification of the rule expressed by Chief Justice COOLEY abrogates the rule entirely. In my opinion one who negligently or wrongfully leaves property at a place where children have a right to be, which property is of a character to invite or tempt the children to play upon it, cannot excuse his liability in the case of injury by the claim that the child is guilty of a trespass. The distinction between leaving such an instrument in a place of public access and leaving it within an inclosure to which children are not supposed to have access is pointed out in the opinion of Chief Justice McALVAY, and is supported by a quotation therein from Wharton on Negligence (2d Ed.), § 112.

The judgment should be affirmed.

McALVAY, C. J., and CARPENTER and MOORE, JJ., concurred with MONTGOMERY, J.

OSTRANDER, J. If defendant owed to plaintiff no duty to take care because plaintiff was, at the time he was injured a trespasser, it should be said, as matter of law, there can be no recovery in this case. If, under all the circumstances disclosed by the evidence, there may have been, notwithstanding the trespass of plaintiff, a duty owed and unperformed, then the case is one for a jury. It is now the settled law of this State (*Hargreaves* v. *Deacon*, 25 Mich. 1; *Ryan* v. *Towar*, 128 Mich. 463 [55 L. R. A. 310]; *Peninsular Trust Co.* v. *City of Grand Rapids*, 131 Mich. 571) that a landowner owes no duty

to a mere trespasser upon his land, whether he is adult or infant, excepting to refrain from inflicting willful injury. It would seem that there should be, logically, no different rule for the case of an infant trespassing upon land and an infant trespassing upon or meddling with personal property, unless there is, in one case or the other, and arising out of other circumstances, some duty to take care. Unless it can be said that in some cases and under some circumstances a duty to take care for an infant trespasser may rest upon the idea of immaturity, of inability to act responsibly, the child and the adult trespasser would, in the same case, it seems, be without remedy. Once it is admitted that a duty of the owner or the user of property to a child may spring from the fact that he is a child, the fact of childhood, and the traits, instincts, and judgments of children, must be taken into account in determining whether a duty has arisen and has been performed. And if the conditions arise in any case so that conduct may be at all measured, legally, by the fact that a child is involved or is likely to be involved with it, I see no reason for a rule that the measure shall not be used when the child is upon my land without right, and shall be used if he meddles with my property in the highway. The child does not increase in maturity, in ability to judge correctly, does not lose childish instincts and proclivities, temporarily, because he is upon the land of a private owner.

The opinions of this court in *Powers* v. *Harlow*, 53 Mich. 507, and in *O'Leary* v. *Telephone Co.*, 146 Mich. 243, unquestionably recognize and give effect to the proposition that the duty of the owner of personal property to an intermeddler therewith may be measured, in some degree, by the youth of the intermeddler. They also contain a statement and an application of the idea that from the fact of infancy alone intermeddling is to be apprehended and to be, in some cases, provided for. In the opinion in *Powers* v. *Harlow*, it is said:

" Children, wherever they go, must be expected to act upon childish instincts and impulses; and others who are chargeable with a duty of care and caution towards them must calculate upon this, and take precautions accordingly."

The duty to take care was found, in that case, in the fact that an invitation had been given to the children to go upon the land. In the *O'Leary Case* evidence of the negligence of defendant was found, not in occupying the street with the apparatus nor in its use there by defendant, but in failing to observe a duty growing out of a condition immediately presented by the fact that children of tender years were present, were attracted to the apparatus, had been riding upon and handling the rope running through the pulley. The testimony upon this point is set out in the opinion. It was said to be for the jury to determine whether the duty existed, and, if it did, whether it was performed. In *Kaumeier* v. *Railway Co.*, 116 Mich. 306 (40 L. R. A. 385), distinguished in the *O'Leary Case*, the rule of *Ryan* v. *Towar* was applied in a case where children meddled with a small flat car, left by a street-railway company, unblocked and without a brake, on a switch in the highway—a car which, when so left on other occasions, had been, to the knowledge of defendant's agents, so played with and upon and pushed about by children of tender years. In the opinion in that case it is said, not only that the children were trespassers, but that—

" The defendant had just as much right to leave this car where it did as a farmer would have to leave his wagon or carriage upon his own side of the highway, and no one would have the right to move it, except upon the claim that it impeded public travel. The car being rightfully left where it was upon the track, and not being a thing dangerous in itself, the court should have directed the verdict in favor of defendant."

The court could not have reached the conclusion, as it did, that there was no evidence of defendant's negligence, except upon the theory that, under the circumstances of

the case, no duty to take care for the playing, trespassing children existed.   Undisturbed, the car was not a dangerous thing; in motion, it was dangerous.  The rule to be deduced from the decision seems to be this—that if personal property, mischievous only when set in operation, is left at rest in the highway, and becomes mischievous and does damage because set in motion by a meddler, to whom the owner owes no duty of care, the owner is not liable to such meddler for any resulting injury, although he was an infant, and although the owner knew that infants had, and were again likely to, set the object in motion.   It seems clear that if the wind or some force other than that of the injured meddler had set the car in motion, and if an infant, too young to be negligent, or an adult without negligence, had been hurt, the question of defendant's negligence would have been sent to a jury.

In the case now before us, it is the theory of counsel for plaintiff that defendant ought reasonably to have apprehended that its apparatus, because of its peculiar construction and because it was easily accessible, would be meddled with by children, and that a child or children might be injured; that there was the consequent duty to take care, or to take better care than was taken, to prevent harm.   It is the theory, in part, of counsel for defendant that the apparatus was not in itself dangerous, because mischievous only through singular means, the employment of which was not to be expected, and that it injured no one to whom defendant owed a duty.   Testimony given tended to prove that the defendant's wagon, of peculiar construction, painted red, had a brake and seat in front, a platform and pump and hose at the rear, a pipe running into the top of the tank, an open vent in the top of the tank, a tool box on the side, not locked, containing wrenches, pipe, plugs, and washers.   The tank was one-third or more full of material which, when properly mixed with air, is dangerous as an explosive when in contact with fire.   The wagon as it was constructed was proper and necessary for the

use to which it was put by the defendant, was of a type in common use, and it does not appear that one had before ever been exploded. It was not necessary, in the conduct of defendant's business, to leave the wagon in the street or to leave it, with its contents, anywhere. They had been removed from the gas mains by pumping, and were usually, if not always, finally deposited in the river. The vent in the top of the tank was $1\frac{1}{4}$ inches in diameter, and had been left open to permit the escape of such illuminating gas as was contained in the tank. The contents of the tank had been placed there during the afternoon, the wagon was brought directly from work, the horse put in a nearby barn for the night, and the wagon drawn up, along with other vehicles, within a few inches of the curb in a paved city street in a well built up and populated neighborhood. This at about 5:45 p. m. Within ten minutes after it was so left, two boys, one living close by, had been on the wagon, had been put off by a man employed (but not by defendant) at the barn, had again climbed onto it, the tank had been exploded, and plaintiff, who had trespassed only by climbing to and sitting upon the seat, and was not six years old, had been badly injured. Children had been in the habit of playing on the wagon. "We used to get up there and play band on the wagon." That defendant had actual knowledge of these trespasses is not proved. Those in charge of the barn where defendant's horse was boarded, and near which its wagon was left, did know that children played on the wagon. They did not know that the wagon contained, at any time, the explosive gases. The plaintiff would not have been injured if he had not been on the wagon. Eight jurors found, in answer to a special question, that the playmate of the injured lad exploded the tank with a lighted match. No other cause for the explosion is shown.

Defendant is chargeable with notice that if fire or a spark was communicated to the contents of this tank an explosion was probable. That it could have made it

impossible to explode it by emptying it, and, perhaps, by properly filling all openings into the tank, is certain.   It exercised a choice, and instead of requiring that the wagon be emptied, or be locked up in some building, left it ex- posed in the street, to the chances of the street.   I am not inclined to hold that the conduct of defendant was so reckless that the acts of any person who should be injured are of no consequence; or that it was maintaining a pub- lic nuisance.   The leaving of the wagon in the street in violation of a city ordinance was not negligence, because it was a breach of no duty owed to plaintiff.   *Flanagan* v. *Sanders,* 138 Mich. 253; *Stark* v. *Lighting Co.,* 141 Mich. 575 (1 L. R. A. [N. S.] 822).

We come, then, to the question whether defendant should reasonably have foreseen what did actually occur and so owed a duty to this child, although he was a tres- passer, because he was a child and because children may be expected to climb upon wagons left in the street; and to the further question whether a jury or the court ought to determine if such a duty existed.   I have reached the conclusion, having in mind the previous decisions of this court, that it should be said, as matter of law, that neither the known nor reasonably to be apprehended cir- cumstances imposed upon defendant any duty to take care of or for trespassing children.   It cannot be said to arise out of the mere fact that children may meddle with prop- erty.   And if this could be, in view of our decisions, said, it was not to be reasonably apprehended that a trespasser would explode this tank.   There is no occasion to cite authorities.   They may be found well collected in 5 Mich- igan Law Review, pp. 357–362.   And see *Edgington* v. *Railway Co.,* 116 Iowa, 410 (57 L. R. A. 561).   The case at bar and *Powers* v. *Harlow* and *O'Leary* v. *Telephone Co.* are to be distinguished by the circumstance that in each of those cases a duty to take care existed notwith- standing the fault of the plaintiff.   To affirm the judg- ment, we should have to extend the application of the

principle of *Lynch* v. *Nurdin*, 1 Adol. & E. (N. S.) 29, beyond that originally intended to be given it.

The judgment should be reversed.

HOOKER, J. That the plaintiff was a trespasser upon the property of the defendant, at the time he was hurt, is not open to question. See *Ryan* v. *Towar*, 128 Mich. 463 (55 L. R. A. 310); *Kaumeier* v. *Railway Co.*, 116 Mich. 313 (40 L. R. A. 385); *O'Leary* v. *Telephone Co.*, 146 Mich. 243. He and another boy engaged in a common trespass, and as a result of, or coincident with, this trespass the explosion occurred. If, as the testimony indicates, and as eight of the jurors found, it was the result of intentional ignition by one of the boys, or if the ignition was occasioned by an unforeseen and highly improbable accident, the case is distinguishable from the case of *O'Leary* v. *Telephone Co.*, supra. In that case Mr. Justice BLAIR said:

" There is reasonable ground for distinction between a case where something is left in the highway, which can only injure a child by his meddling with it, and putting it into operation in the absence of the owner or person having it in charge, and a case like the present, when the owner is present operating the apparatus, and has actual notice that the children are attracted by the tackle, and will play with it unless prevented."

That case is authority for the proposition that where one sets in motion, and leaves unattended and unguarded, a machine not usually to be found in the highways, and one likely to be noticed and meddled with by children, such person is negligent, and a young child, incapable of contributory negligence, will not be denied relief, because of his placing his hand upon a rope, whereby it was drawn into the machine and injured. It is not authority for the proposition that a trespasser, who is injured by reason of the setting in motion of a machine, or intentional igniting and thereby causing an explosion of gas, by himself or a trespassing companion, in the absence of the owner, may recover damages for his injury, upon the ground that it

was the duty of the owner to anticipate such results from trespassing children.   The farthest that any case has gone in this State, aside from the *O'Leary Case*, which I have attempted to distinguish, is to hold that where a child is licensed to go upon land, he is not a trespasser, and that the owner owes it to such a person not to leave dynamite cartridges in a situation likely to attract his attention and arouse his curiosity.   The case plainly intimates that had the child not been lawfully upon the premises, the holding would have been different.

In this case the child had a right in the highway, but it was not by reason of a license from this defendant, as in the *Harlow Case*.   There is no opportunity for the claim of an invitation to invade this wagon.   On the contrary these children were expressly forbidden by a person in charge of the barn to climb upon the wagon.   I am not prepared to say that there might not be a subjection of the public to hazards so great as to make an act transcend negligence and amount to wantonness.   Leaving unattended a wagon load of dynamite might be such a case, and it is possible that the courts would hold that even a trespasser might recover in such a case, under the rule that a wanton injury of a trespasser is actionable. But this negligence cannot be said to be wanton.   There was little reason to apprehend danger from this wagon. We may take judicial notice that it takes a flame, live coals, or red-hot metal to ignite a mixture of illuminating gas and air.   It is demonstrated in our daily experience. Therefore, regardless of the question of negligence in leaving the wagon in the highway, the plaintiff's trespass should preclude recovery, the case being plainly distinguishable from and consistent with the *O'Leary Case;* and this is true whether the explosion was caused by ignition from the match of plaintiff's companion, or from some other cause not ascertainable.   To hold otherwise is to extend the right of recovery beyond the *O'Leary Case*, and to disregard the rule of the case of *Kaumeier* v. *Railway Co.*, supra.

We have settled the principle in this State that an owner of property owes no duty of care, except to avoid wanton or willful injury, to one who trespasses upon said property, that he is not required to anticipate and guard against a trespass, that there is a clear distinction between temptation and invitation, and that the ownership of an article which may attract children does not carry with it an obligation to guard it, lest trespassing children be injured through applying it to their own uses, and that in this respect there is no difference between adult and juvenile trespassers. That doctrine was deliberately adhered to and affirmed in *Ryan* v. *Towar*, 128 Mich. 463 (55 L. R. A. 310), which followed *Hargreaves* v. *Deacon*, 25 Mich. 1, where a child of tender years fell into an unguarded and "*attractive*" cistern upon the defendant's premises and was drowned. In that case this court did not overlook the humanitarian side of the question and said:

"There is some danger in dealing with these questions of confounding legal obligations with those sentiments which are independent of the law and rest merely on grounds of feeling or moral considerations. We feel, usually, more indignation at wrongs done to children than at wrongs done to others. But the law has not usually given them civil remedies on any such basis. Nor does it usually, if ever, impose any duties on strangers towards them, resting entirely on the fact that they are children. Those who have any special dealings with them, as parents, teachers, and employers, incur obligations appropriate to their relations and differing from those incurred towards others in proportion to the necessity of care and protection and the risk of injury. But those who have no such relations with them are not liable for negligence in carrying on their own business beyond what would be their liability to others, as well as children, who are equally free from blame.

"If, for example, a grown person, coming upon the premises simply by the permission of the occupants, had fallen into this cistern without any negligence, by stepping where there was no apparent danger, he would in law have stood just where this child did. The injury might have happened, as in *Fisher* v. *Thirkell*, 21 Mich.

1, from the insecurity of an apparently safe covering. We have searched diligently, and perhaps a little anxiously, to find legal support for a distinction, but there is no foundation for any in law, and we think there is none in any reason which should govern the action of courts of justice.

"There is no difficulty at all in holding parties liable for any intentional mischief, however it may be covered up. If they prepare means of destruction for the malicious purpose of destroying life or inflicting injuries, there is no room for the application of the doctrine of negligence, and the act which they mean to bring about is none the less their act because brought about indirectly. If a pitfall is made with the intention of having human beings fall into it, or a spring gun is set for the purpose of destroying them, or poison is mingled with a spring, or with food, for any similar purpose, fatal results would make the act willful homicide as plainly as if one had been thrust into the pit, or shot, or poisoned directly. But where injury arises to a person from the neglect of one, in doing his lawful business in a lawful way, to provide against accident, the question arises at once whether he was under any legal obligation to look out for the protection of that particular person under those particular circumstances. For the law does not require such vigilance in all cases, or on behalf of all persons."

The foregoing language from the pen of the late Mr. Justice CAMPBELL was concurred in by such of his associates as participated in the hearing, Mr. Justice GRAVES not sitting.

When *Ryan* v. *Towar* was decided, two members of the court were of the opinion that *Hargreaves* v. *Deacon* was not controlling, resting their opinion for authority upon the *Turntable Cases*, so called, and for reasons upon the proposition that a landowner does or should owe a duty to keep his premises safe against danger to trespassing children, who might be tempted to trespass, by alluring objects upon the premises. A majority of the court did not take that view, thinking it destructive of and an overruling of the principle of that case, for the very reasons stated so well by Mr. Justice CAMP-

148 MICH.—4.

Bell in *Hargreaves* v. *Deacon*, and while it is sometimes said that the rule of *Ryan* v. *Towar* was established by a majority of one judge only, that is not strictly true, for it merely followed and reaffirmed the broad principle that a trespasser, injured through and by reason of his trespass, could not recover damages against the owner whose property was trespassed upon, which had been the settled law of this State since the decision of *Hargreaves* v. *Deacon* in 1872, which doctrine has never been limited to trespasses on land.   It has since been followed in the case of *Peninsular Trust Co.* v. *City of Grand Rapids*, 131 Mich. 571, just such a case as *Hargreaves* v. *Deacon*, where a child had trespassed and been drowned in a cistern or reservoir.   The former dissenting judges concurred with the majority in holding that the case was within the ruling in *Ryan* v. *Towar*.   It might have been added to the opinion that the case was also on all fours with *Hargreaves* v. *Deacon*.   There is no escape, therefore, from the fact that the rule of *Hargreaves* v. *Deacon* is the settled law of this State.   The cases mentioned settle three things:  (1) That a trespasser cannot recover for injuries due to his trespass;  (2) that the rule applies equally to infants as to adults, regardless of the attractiveness of the premises, or things thereon, to children;  (3) that the owner owes no duty to anticipate or guard against injuries to trespassers upon his property, whether adult or juvenile.

It is now said that all that these cases decide is that these things are the law where the trespass is upon land, because the trespasses were upon land in those cases, and therefore those cases are no impediment to holding one liable to a trespasser on personal property on the highway, and that what is said in those cases can have no legitimate weight in a case of that kind.   Whether we are to understand that one who meddles with the property of another upon the highway is not to be considered a trespasser, or that a person though a trespasser, if he invades land of another, is not a trespasser when he climbs upon a wagon

in the highway, or that a child is not a trespasser in such a case, though an adult would be, although both would be trespassers if they entered upon land of another, is not made clear.  There is another alternative, viz., that while one does not owe a duty to a trespasser upon land he does to a trespasser upon the personal property in the highway, especially if, the property is attractive enough to induce a child to trespass, and it goes without saying that in every such case it must have been so attractive or the child would not have trespassed.  Everybody knows that he who invades and injures personal property of another is a wrongdoer, and liable for the damages, although he be a child.  The boy who blew up the gas wagon is liable as a wrongdoer, and would be, though it had been accidental, because he was trespassing.  Whichever horn of the dilemma is taken, we find the three cases cited an obstacle to recovery.  They all say that an owner of property owes no duty to guard a trespasser, and that the rule applies to juveniles as well as to adults, and all admit that adults cannot recover in such cases.  The case of *Ryan* v. *Towar*, expressly, and of *Hargreaves* v. *Deacon*, impliedly and necessarily, repudiates the doctrine that the fact that the article trespassed upon is "attractive to children" makes a difference, in the legal relations of the parties, if the injury is due to trespass.  The consequences to this child would have been the same had this wagon stood across the walk upon private ground.  It would have been just as attractive, and he would have been just as much, and no more, a trespasser upon the wagon.  In our judgment, an attempt to discriminate between rights of a trespasser when the wagon is in the highway, and when it is on private ground, results in nothing more than a distinction without a difference.  The judicial art of distinction is a dangerous weapon, and it is open to the danger of being greatly overworked, as is indicated in *Hargreaves* v. *Deacon*, as well as *Ryan* v. *Towar*.  As we attempted to show in the latter case the reasons given for the distinction made by the *Turntable Cases* were

many and divergent in principle, and they were similar chiefly in one respect, viz., the inability of each of them to fairly stand alone. The reason implied in the dissenting opinion appears to be that a temptation may be construed to be an invitation. We have supposed that we had authoritatively decided the contrary in *Hargreaves* v. *Deacon*, *Ryan* v. *Towar*, and *Peninsular Trust Co.* v. *City of Grand Rapids*, and we think that it will not be denied that we did, so far as any invitation to enter upon land is concerned. And it has been said that the doctrine of invitation relates to an entering upon or a user of land. *Friedman* v. *Snare & Triest Co.*, 71 N. J. Law, 611 (70 L. R. A. 147). How that can be true, and yet be consistent with the idea that this gas wagon's presence was an invitation to children to climb upon and blow it up, is not clear to us. But·if, as contended, *Ryan* v. *Towar* and *Hargreaves* v. *Deacon* go for naught as authority upon this question, we may be permitted to refer to their comment upon authorities which do, or at least to the authorities themselves. In the latter case Mr. Justice CAMPBELL was evidently able to see an analogy between trespasses upon realty and trespassers on personal property, for he approves *Mangan* v. *Atterton*, L. R. I. Exch. 239, a case where one who publicly exposed a machine on market day was held not responsible where little boys meddled with it and one got his hand hurt. The *Ryan Case* was decided in 1901.

There have been many decisions of this question since, and we refer to a Virginia case, *Pannill* v. *Railroad Co.*, 105 Va. 226 (4 L. R. A. [N. S.] 80). This was a turntable case and the authority of the *Turntable Cases*, so called, is denied. Of invitation the opinion says:

" 'The viciousness of the reasoning,' said the court of appeals of New Jersey, in the case of *Delaware, etc., R. Co.* v. *Reich*, 61 N. J. Law, 635 (41 L. R. A. 831), in discussing this question, 'which fixes liability upon the landowner because the child is attracted, lies in the assumption that what operates as a temptation to a person of immature mind is, in effect, an invitation, such an assumption is

not warranted.   As said by Mr. Justice Holmes (now a member of
the Supreme Court of the United States) in *Holbrook* v. *Aldrich,*
168 Mass. 16 (36 L. R. A. 493) :

> " ' "Temptation is not always invitation.   As the common law is
> understood by the most competent authorities, it does not excuse a
> trespass because there is a temptation to commit it, or hold property
> owners bound to contemplate the infraction of property rights be-
> cause the temptation to untrained minds to infringe them might
> have been foreseen." '

"No landowner supposes for a moment that by grow-
ing fruit trees near the highway, or where boys are ac-
customed to play, however much they may be tempted to
climb the trees and take his fruit, he is extending to them
an invitation to do so, or that they would be any the less
trespassers if they did go into his orchard because of the
temptation.   No one believes that a landowner, as a matter
of fact, whether a railroad company or a private individual,
who makes changes on his own land in the course of a
beneficial user, which changes are reasonable and lawful,
but which are attractive to children, and may expose them
to danger if they should yield to the attraction, is by that
act alone inviting them upon his premises.

"This doctrine of constructive invitation is not sus-
tained, as it seems to us, by the English cases cited to
sustain it, and has been utterly rejected by the highest
courts of New Hampshire, Massachusetts, New York,
New Jersey, Rhode Island, Michigan, and West Virginia.
In several other States it is limited in its operation to
*Turntable Cases.*   See *Frost* v. *Railroad,* 64 N. H. 220;
*Daniels* v. *Railroad Co.,* 154 Mass. 349 (13 L. R. A.
248); *Walsh* v. *Railroad Co.,* 145 N. Y. 301 (27 L. R.
A. 724); *Delaware, etc., R. Co.* v. *Reich,* 61 N. J. Law,
635 (41 L. R. A. 831); *Uthermohlen* v. *Bogg's Run Co.,*
50 W. Va. 457 (55 L. R. A. 911); *Ryan* v. *Towar,* 128
Mich. 463 (55 L. R. A. 310); *Paolino* v. *McKendall,* 24
R. I. 432 (60 L. R. A. 133); *Dobbins* v. *Railway Co.,*
91 Tex. 60 (38 L. R. A. 573); *Savannah, etc., R. Co.*
v. *Beavers,* 113 Ga. 398 (54 L. R. A. 314).

"The maxim ' Sic utere tuo ut alienum non laedas '
has been quoted in some of the ' *Turntable Cases,*' and
relied on as affording a decisive reason, or ground, for
establishing a duty upon the railway company, and as
per se justifying a recovery against it.   There may be
more, but there is one conclusive answer to the argument
based on that maxim, and that is that it refers only to acts

of the landowner, the effects of which extend beyond the limits of his property.

"In *Deane* v. *Clayton*, 7 Taunt. 489, Gibbs, C. J., said:

" ' I know it is a rule of law that I must occupy my own so as to do no harm to others, but it is their legal rights only that I am bound not to disturb. Subject to this qualification, I may occupy or use my own as I please. It is the rights of others, and not their security against the consequences of [their] wrongs, that I am bound to regard.'

"In *Knight* v. *Abert*, 6 Pa. 472, where an effort was made to apply the maxim to sustain an action by the owner of cattle, which had trespassed upon the lands of another, and had been injured by reason of the unsafe condition of the property, Chief Justice Gibson said:

" ' A man must use his property so as not to incommode his neighbor; but the maxim extends only to neighbors who do not (uninvited) interfere with it, or enter upon it. * * * If it were not so, a proprietor could not sink a well or a saw pit, dig a ditch or a mill race, or open a stone quarry or a mine hole on his own land, except at the risk of being made liable for consequential damage from it, which would be a most unreasonable restriction.' "

Of the reasons given for the rule of the *Turntable Cases*, the following is apropos:

"Upon neither of the grounds relied on do we think that the common law makes it the duty of a landowner to have his premises in a safe condition for the uninvited entry of adults or children, nor to take affirmative measures to keep them off of his premises or to protect them after entry; and this view is strengthened by the fact that so many of the courts which have adopted the doctrine of the ' *Turntable Cases*,' restrict it as far as possible to turntables, and refuse to follow it to its natural and logical consequences. For if it be a rule of the common law that a landowner, who, in the reasonable and lawful use of his property, makes changes thereon which have the double effect of attracting young children to the land and at the same time exposing them to serious danger, is guilty of negligence, unless he exercises reasonable care for their safety, either in keeping them off the land, or in protecting them after their entry thereon, the rule would apply, not only to railroad companies and their turntables, but to all landowners who, in the use of their land, maintain upon it dangerous machinery or conditions which present

a like attractiveness and temptation to children. The common law applies alike to all landowners under like conditions, and it would be an anomaly to hold that a doctrine or rule of the common law which had its origin before there was either railroads or turntables applies only to railroad companies in the use of their lands upon which they have dangerous machinery. While the courts should and do extend the application of the common law to the new conditions of advancing civilization, they may not create a new principle, or abrogate a known one. If new conditions cannot be properly met by the application of existing laws, the supplying of the needed laws is the province of the legislature, and not of the judicial department of the government. *Connelly* v. *Telegraph Co.,* 100 Va. 59 (56 L. R. A. 663). The legislature can change the common law as far as may be necessary to regulate the use of turntables and other dangerous appliances, and leave untouched the common-law rights of the ordinary landed proprietor."

This is language pertinent to a recent article upon this subject. See 5 Michigan Law Review, p. 359. The author says:

"Some courts have given one answer and some the other. Let us first consider some cases which absolve the owner from any liability. They are grounded upon the proposition that a man in the use and enjoyment of his land is under no obligation to exercise any care to avoid injury to a trespasser. Put in the form of a syllogism, it is this: All trespassers assume all risks except that of willful injury. These children are trespassers. Therefore, they assume all risks except of willful injury. It looks logical. It is beautifully simple. But it is also brutally cruel. * * *

"Some courts have based their holdings in favor of the child, on the ground that a thing attractive to him is an implied invitation, and he thereby ceases to be a trespasser. But this is at best a fiction, for 'temptation is not invitation,' and fiction has been overworked in the common law, and is entitled to be, and should be, retired. We prefer to put the infant's right to recover on the broad ground that the owner of property is under a legal duty to exercise reasonable care to avoid an injury to a trespasser of tender years, where such injury was foreseeable. This duty need not be onerous. It is a fact at once start-

ling and incontrovertible, that in almost all the cases the injury could have been prevented by slight care and at a trifling expense. We are not satisfied with those courts that say that any such duty upon the property owner can be imposed only by the legislature, for the reason that such statement is not true. That it is not true is shown by the fact that the majority of courts have reached an opposite conclusion, and they are sustained in such conclusion by the fact that all admit who know what is meant by the common law, viz., that it is not crystallized, but is vital, and owes its present importance, if not its existence, to its adaptability to new conditions."

At one and the same time the writer disapproves such reasons as the courts have been able to give for departing from the well-settled rule, which he calls "fictions of the law," which he admits "have been overworked," and "should be retired," and prefers to substitute a reason that under a legal duty which the law has not hitherto imposed upon him the owner should be required "to exercise reasonable care to avoid an injury to a trespasser of tender years when such injury was foreseeable." The Virginia court is clearly right in saying that the courts should leave this to the legislature. Mr. Justice Buchanan continues:

"The court of appeals of New Jersey, in refusing to follow the doctrine of the '*Turntable Cases*,' said that the doctrine would require a similar rule to be applied to all owners and occupiers of land in respect to any structure, machinery, or implement maintained by them, which presented a like attractiveness and furnished a like temptation to children.  -

"'He who erects a tower capable of being climbed, and maintains thereon a windmill to pump water; * * * he who leaves his mowing machine, or dangerous agricultural implements in his field; * * * he who maintains a pond in which boys may swim in summer, or on which they may skate in winter—would seem to be amenable to this rule of duty. Climbing, playing at work, swimming, and skating are attractions almost irresistible to children, and any landowner or occupier may well believe that such attractions will lead young children into danger. Many other cases of like character might be imagined. In all of them the doctrine of

the "*Turntable Cases*," if correct, would charge the landowner * * * with the duty of taking ordinary care to preserve young children thus tempted on his land from harm. The fact that the doctrine extends to such a variety of cases, and to cases in respect to which the idea of such a duty is novel and startling, raises a strong suspicion of the correctness of the doctrine, and leads us to question it.' *Turess* v. *Railroad Co.*, 61 N. J. Law, 314. * * *

" The supreme court of Minnesota, which was one of the first to give its adherence to the turntable doctrine (*Keffe* v. *Railway Co.*, 21 Minn. 207), in the subsequent case of *Stendal* v. *Boyd*, 73 Minn. 53 (42 L. R. A. 288), through its Chief Justice said:

" 'The doctrine of the *Turntable Cases* is an exception to the rule of nonliability of a landowner for accidents from visible causes to trespassers on his premises. If the exception is to be extended to this case [a dangerous excavation filled with water on a city lot, in which a little boy had been drowned], then the rule of nonliability as to trespassers must be abrogated as to children, and every owner of property must, at his peril, make his premises child-proof.' "

He concludes his opinion with a quotation from a Texas case, where the turntable rule is said to prevail:

" ' The difficulty,' " he said, " ' about those cases [*Turntable Cases*] is that they either impose upon owners of property a duty not before imposed by law, or they leave to a jury to find legal negligence in cases where there is no legal duty to exercise care. In these cases the courts, yielding to the hardships of individual instances where owners have been guilty of moral, though not legal, wrongs in permitting attractive and dangerous turntables and water holes to remain unguarded on their premises in populous cities, to the destruction of little children, have passed beyond the safe and ancient landmarks of the common law and assumed legislative functions in imposing a duty where none existed.' *Dobbins* v. *Railway Co.*, 91 Tex. 60 (38 L. R. A. 573)."

A note to this case states that the doctrine of the *Turntable Cases* has been very generally disapproved as to everything except "*Turntable Cases*"—citing cases from Texas, Georgia, Wisconsin, New Jersey, California, Montana, and Minnesota, most of which (especially Minnesota) have followed the *Stout Case* as to turntables.

The question of "landholders' liability to children" has received exhaustive consideration in the learned essay of Jeremiah Smith in 11 Harvard Law Review at pages 349 and 434, in which he clearly shows the fallacy from the standpoint of authority, of the holding in the *Turntable Cases*, and from the standpoint of reason the unjust consequences of the *Turntable Cases*.  On page 448 he cites a long list of cases refusing to extend the rule to other dangerous situations.  Of the general duty of society to act as "wet nurse" to children in general he says:

"The child, it is said, is incapable of protecting itself; and hence it is eloquently contended that the law must impose the duty of protection upon landowners.  The apparent assumption is that all the children in the world are mere waifs and strays, and that the duty of caring for them must be imposed upon the landowners because the law can find no one else to bear the burden.  The fact is that the vast majority of children have protectors appointed alike by nature and by law, viz., their parents who have legal power to control their actions, and whose moral duty to keep their children from entering upon dangerous premises is generally regarded as at least equal to the moral obligation of the landowner to fence them out.  If the child, upon entering on the premises, is hurt by the 'active negligence' of the owner in bringing force to bear upon him, it may well be that the negligence of the parent in failing to restrain the child's entrance does not bar the child's recovery for the force thus brought to bear upon him after his entrance.  But it is going far beyond this to say that the child can recover for harm sustained by him through the condition of the premises without the immediate intervention of any human agency save his own.  When a child wakes up in the morning in his father's house the duty of providing a safe playground for him during the day rests upon his parents.  Is this duty shifted from the parent to private landowners because the child chances to escape from the parent's care?  If those who brought the child into the world are unable, by reason of poverty, to provide him a playground, this may afford an argument for the passage of a statute imposing that duty upon the municipality, in which case each landowner would have to contribute his proportion of the expense.  But this is quite another thing

from assessing upon a single unfortunate landowner the entire damage arising from the want of such a playground.

"Even if it be conceded that the child cannot maintain a civil action against his parents to recover damages for their neglect to guard him from harm, still the parental duty, created by nature, and certainly recognized to some extent by law, cannot be ignored in determining whether to impose a legally enforceable duty upon landowners to keep their premises in safe condition for the entrance of uninvited children. If it be urged that children are so largely guided by sudden impulse that it is impossible for parents always effectually to protect them, two answers may be made: *First,* the parents can, in fact, protect the children in the great majority of instances; *second,* if the duty is so impossible of performance that it would be a hardship to impose it upon the parents, it seems unfair to impose it upon the landowner, whose knowledge of the characteristics of any particular child cannot be equal to that possessed by its parents. It is hardly too much to say that the doctrines enumerated in some cases, if carried to their logical conclusion, 'would charge the duty of the protection of children upon every member of the community except their parents.'"

Continuing, he shows not only the injustice but the hazards of such a rule, which were pointed out in the majority opinion of *Ryan* v. *Towar*, and have been thought important enough to mention by nearly every judge who has written an opinion upon the subject denying the rule of the *Turntable Cases.*

"It is the policy of the law not to expose certain classes of persons, or their acts and conduct in certain situations, to the harrowing uncertainty and vexation of litigation. In a certain sense, it is true, as was said by Mr. Justice Holmes, that the use of one's own land is conduct 'of the most highly privileged kind.' We have seen that there are various cases of user causing damage beyond the borders of the land where the majority of courts refuse the sufferer permission to litigate even the question of the owner's motives. Are there not at least equal reasons for refusing permission to litigate the questions of attractiveness and prevention in the class of cases now under consideration?

" It is true that a judge may sometimes rule that there is no evidence upon which the case can go to a jury. But if the qualified liability contended for is once admitted and is consistently applied, a judge can seldom withhold the plaintiff's case from the consideration of the jury. A question of fact, not of law, would generally be involved, and there would be a remarkable absence of definite tests.

" What object is not attractive to children ? And how seldom can it be said that the attraction is not fraught with danger ?

" ' The average boy,' said Mr. Justice Mitchell, ' can make a plaything out of almost anything, and then so use it as to expose himself to danger.' *Twist* v. *Railroad Co.,* 39 Minn. 167.

" Under this test, almost anything is attractive and dangerous which a jury may think fit to call so.

" What definite age can be named as the time when young children cease to be guided by instinct and become capable of self-protection ? How is the court to effectually restrain the tendency of the jury to attribute the conduct of all children to their childish instincts ? No doubt a nonsuit can occasionally be ordered, or a verdict set aside as against evidence. But in the greater number of cases it will be found impossible to prevent these questions of childish instinct or capacity from going to the jury, and almost equally impossible to disregard their verdict.

" What standard of care can be adopted that will not practically result in juries holding landowners to the responsibility of insurers ? If the court simply instruct that the requirement is ' reasonable care,' then it is likely that ' reasonable ' in the opinion of the jury will connote a super-human amount of energy and foresight. And the effect will not be substantially different if the court give a fuller explanation of the term. If it be once conceded that a duty rests on the landowner to use care to keep children off his property, or to protect them while there from dangers arising from the usual condition of the premises, then it would be absurd to require of him so small an amount of care as would be unlikely to serve the end aimed at. If he is held to be under any duty in this regard, it is not likely to be set lower than this—viz., a duty to use such an amount of care, to use such precautions, as will render it improbable that harm will result

to children attempting to enter upon his premises. But this would in truth require in many cases precautionary measures which could not be carried out save at an expense, or in a manner, practically prohibitive of all beneficial user.

> " 'To hold that every piece of ground which contains some place or some thing that might be dangerous to children must be so fenced that children can enter only by what is practically a mode of siege would be to lay an intolerable burden on proprietors.' *Ross* v. *Keith,* 16 Scotch Sess. Cas. (4th Ser.) 89.

"Yet will any less efficacious method be regarded as affording reasonable probability that no child catastrophe will occur? It must be remembered that a jury will not reach this question unless they have already found that the premises were attractive and dangerous to children. Assuming the attractiveness and the danger, and assuming that the proprietor is under a duty to use care to guard children against this danger, can that duty be performed to the satisfaction of a jury save by making his ground 'practically impregnable' to children, in other words, 'child-proof?' But would not this, in many instances, compel the total cessation of profitable user? Take the case of an artificial pond, the creation of which was a practical necessity for manufacturing purposes, or to store water for stock or irrigation:

> " 'A pond cannot be rendered inaccessible to boys by any ordinary means. Certainly no ordinary fence around the lot upon which a pond is situated would answer the purpose; and, therefore, to make it safe, it must either be filled or drained, or, in other words, destroyed.' *Peters* v. *Bowman,* 115 Cal. 355.

"Furthermore, the counsel for the plaintiff will urge that the very occurrence of the accident is in itself decisive evidence that reasonable care was not used to prevent it; and this application of the res ipsa loquitur doctrine, though an overstatement and discountenanced by the judge, is likely to carry controlling weight in the deliberations of the juryroom.

"Suppose even that the judge goes still further (much further, indeed, it is believed, than judges have generally gone), and tells the jury that, in determining what is reasonable care, they should take into account, not only the desirability of preserving innocent children from harm, but also the desirability of making beneficial use of land.

How much weight will the jury allow to the latter consideration when put into competition with the former in a concrete case appealing to their sympathies? How much consideration will they give to the general impolicy of hampering the use of land with troublesome and expensive restrictions when they have before them a maimed child, or the mourning relatives of a deceased infant?

"Where the existence of a legal duty is once admitted, the danger that a jury will be too swift to find a breach of it does not afford a sufficient reason for abrogating the duty. But when the question under discussion is whether a duty should be held to exist, whether in a particular class of cases the law ought to impose a duty, and when the case is confessedly on the border line, and other strong reasons can be given against establishing the duty, then the probability that the rule contended for would often be misapplied by juries may well be given great and even decisive weight in influencing courts against the establishment of the alleged duty. Notable instances where the court frankly admitted itself to be influenced by the consideration that practical injustice would frequently result from the recognition of an alleged doctrine are to be found in the late decision of the New York court of appeals in *Mitchell* v. *Railway Co.*, 151 N. Y. 107 (34 L. R. A. 781), and in the still more recent decision of the Massachusetts supreme court in *Spade* v. *Railroad Co.*, 168 Mass. 286, where Mr. Justice Allen said:

"'It would seem, therefore, that the real reason for refusing damages sustained from mere fright * * * probably rests on the ground that in practice it is impossible satisfactorily to administer any other rule. * * * But, as the law is a practical science, having to do with the affairs of life, any rule is unwise if, in its general application, it will not, as a usual result, serve the purposes of justice.'"

See, also, *Sullivan* v. *Huidekoper*, 27 App. D. C. 154 (5 L. R. A. [N. S.] 263); where the District of Columbia court of appeals disapproves the doctrine of the *Turntable Cases*, and refuses to extend the principle to analogous cases, though admittedly bound by it in *Turntable Cases*.

We have discussed *Ryan* v. *Towar*, and supported it with recent decisions and reasoning of judges, because we consider the *Turntable Cases* to be radically wrong

in principle, and erroneous in their reasoning, and for the more important reason that they are an entering wedge for the broad rule relied on in this case.    If they are sound, the analogy that they bear to this case would justify plaintiff's claim in a proper case; if they are wrong, the analogy fails, and this case is then left to stand upon *Hargreaves* v. *Deacon*, and *Ryan* v. *Towar*, so far as analogy to trespassers upon land have any bearing, and such cases as may be produced of injuries to trespassers on highways.    There is at least this analogy, i. e., that one who meddles with property on a highway where its owner has a right to have it is a wrong-doer, liable for all damages resulting from his trespass, and, if an adult, concededly without redress if he get hurt, unless, perhaps, it may be, in the cases of discovered negligence, willful or wanton injury.    There is also a plain distinction between cases where a person innocent of trespass or meddling is the passive sufferer from an active agency belonging to another, and a case where the agency is passive and the injury is due to the wrongful activity of the injured person.    The case of *Kaumeier* already cited is one of the latter kind, while that of *O'Leary* is made to turn on this distinction.

We quote from the case of *Friedman* v. *Snare & Triest Co.*, 71 N. J. Law, 606 (70 L. R. A. 147), which we consider directly in point on this case.    Incidentally it recognizes the infirmity of the *Turntable Cases*, and the *application to this question* of those cases, denying their authority.    Some iron girders were left in the highway carelessly piled, so that when a small child made a playground of them one fell upon her and injured her.    After recognizing the right to indict one who creates a nuisance by obstructing the street, and the right of one damnified by the nuisance, while in the exercise of his rights in the street, to maintain a private action, the court said:

"But this refers only to parties injured while using the street as a street, and not to those whose injuries arise from their attempted use of the obstructing materials for

their own purposes, whether of pleasure, convenience, or profit.   For the building materials themselves do not in any sense become public property by being allowed to remain in the street.   And neither a traveler, nor an idler, nor even a playful child, can gain rights against the landowner, or against his agent who stands in his rights, by using such building materials as a resting place or playground."

The learned judge continues:

" In the absence of circumstances denoting invitation, one thus using the private property of another for his own purposes may be either a licensee or a mere trespasser, depending upon circumstances.   In neither case is there any duty incumbent upon the proprietor to make his property safe for such use.   Aside from the notion that temptation is equivalent to invitation ( with which we cannot concur), there is nothing in the mere existence of building materials as an obstruction in the street that denotes an invitation to the passerby or to the idler or playful child to use the materials for his own purposes.   The doctrine of invitation relates to the entry upon or the user of lands. The very fact that materials piled upon the ground constitute a hindrance to travel negatives the idea of invitation in the ordinary sense."

Of the fetich " attractiveness to children" it was said:

" The case for the plaintiff rests upon the theory that since these girders were so arranged as to be attractive to children, and since the injured child, with her companions, was using them as a place for play, or as a resting place during or after play, the proprietors of the premises, or the defendants, upon whom as independent contractors the matter had been devolved, owed a duty to the children to so arrange the girders as to render them safe for their use.   With this view we do not agree.

"No doubt where a duty exists to take care with respect to the safety of children of tender years, their very age must be taken into account, so that what might be reasonable care with respect to the safety of adults, who are capable, to some extent, of looking out for themselves, might not be reasonable care with respect to children.   But in the present case ' the very question is whether any duty existed, and we are not able to see that the age of the child is pertinent upon this inquiry.   That

the party injured in this case was less than five years of age did not at all tend to give her any property interest or right of user in the defendant's girders.   Whether she used them as licensee or as trespasser, in either case there was no duty upon the owner to exercise active care with respect to her safety."

The circumstance of attractiveness is given its proper force in connection with the question of contributory negligence.

" The fact that a dangerous place or object is attractive to children of tender years is legitimately significant where the question of their own want of care is raised. But there are fundamental, and, as we think, insuperable, difficulties standing in the way of adopting the rule that the mere attractiveness of private property gives to the person attracted rights against the owner.   One difficulty is that the rule pro tanto ignores the distinction between meum and teum.   And on what principle is it to be limited to cases of trespass ?   Why does it not apply equally to the conversion of personal property, or even to larceny ? If those who temporarily and for limited purposes convert the private property of their neighbors to their own use are to be not only excused but justified, where by reason of their tender years they were tempted to the trespass, and at the same time are to have rights of action against the true owners for the failure to exercise care about rendering the property suitable for their use, why may not those who under similar temptation convert the property of others wholly to their own use be likewise justified, and instead of a right of action gain a complete title to the property by simply appropriating it ? "

Other cases have made this application of attractiveness and it is a proper one under our decisions on the subject of contributory negligence of children.   Here a court was found who deemed it proper to consider and refer to the probable consequences the rule contended for (and the Virginia court has done the same), which we took occasion to do in *Ryan* v. *Towar*, and sharing our fears of the consequences of a departure from established legal landmarks:

" Another and a very practical difficulty that confronts

the attempt to lay down any legal rule that depends for its limitations upon the attractiveness of objects to children of tender years lies in the extreme improbability that any man, however prudent, will be able to foresee what may or may not be attractive to children. Certainly if a pile of steel girders, each weighing 1,000 pounds, deposited in the street, as the girders in the present case were deposited, must be foreseen by a prudent man to be attractive to children, we are unable to say what object may not be thus attractive.

" These are the views which we entertain after a careful consideration of the question at issue in this case after most learned and able arguments by counsel on both sides, and a review of numerous reported decisions touching more or less closely upon the point."

It will be noticed that it is a case that can fairly be said to have decided every point that we have in the present case against the contention of plaintiff's counsel and in accordance with *Ryan* v. *Towar.*

A discussion of this case would not be complete without considering its view of the English cases. In *Ryan* v. *Towar* we said that the first case cited as a precedent—

" Was *Lynch* v. *Nurdin*, 1 Adol. & E. (N. S.) 29. In that case it was held that a child who, seeing a horse and cart unfastened in the street, got into the cart and was injured, could maintain an action against the owner. The case seems to have gone off upon the questions of negligence and contributory negligence, and, no question of trespass being discussed, the inference is perhaps a proper one that it was found by the jury that the owner was negligent in leaving his horse loose in the public street, and that the child had shown as much prudence as could be expected of him. Not only was there apparently no consideration of this question, but later English cases are in conflict with that case, if it necessarily involved it."

Upon this case the following comment is made.

" So far as the report of the case shows, however, the latter ground was not relied upon, and the motion for new trial was rested solely on the ground that the plaintiff's injury arose in part from his own fault and in part from the fault of his playmate. Curiously enough, the existence of a duty to the playing children, whose breach

would constitute actionable negligence, was not made the subject of argument.   It appears clearly that no question was raised before the court upon this point.   Defendant's negligence having been conceded by counsel, the remarks of Chief Justice Lord Denman are hardly to be treated as a considered judgment upon that question.   The only controverted point that seems to have been determined was that, although the plaintiff's own act co-operated to produce his injury, he was not for that reason debarred from recovering compensation in respect of defendant's negligence, and this because of the plaintiff's tender years."

The court adds:

"It is safe to say, therefore, that so far as *Lynch* v. *Nurdin* is relied upon in support of the present action it has been distinctly discountenanced, if not necessarily overruled, by the later English decisions.   It is true it was relied upon by our supreme court in *Danbeck* v. *Traction Co.*, 57 N. J. Law, 463.   But that was the case of a child injured while riding as a gratuitous passenger upon a railway car, having entered it upon the invitation of the conductor, and furnishes no support for the present action."

*Lynch* v. *Nurdin* is not in point, and the majority opinion in *Ryan* v. *Towar*, does not say that it is, but says the contrary.   It is in the dissenting opinion, if in either, that this claim is to be found.

As to *Clark* v. *Chambers*, L. R. 3 Q. B. Div. 327, which the dissenting opinion in *Ryan* v. *Towar* cites as disapproving *Mangan* v. *Atterton*, the New Jersey case shows that it was not disapproved so far as any point involved in this case or *Ryan* v. *Towar* is concerned.   Of the doctrine of the *Turntable Cases* the court says:

"We deem it unnecessary to rehearse at length the decisions cited by counsel for the plaintiff from the courts of some of our sister States affirming, as is claimed, the general principle upon which the present plaintiff's right of action is based.   Many, if not most of those decisions, depend, fundamentally, upon the same notion that in many States, and in the Supreme Court of the United States, has been given effect in the so-called '*Turntable*

*Cases,'* which will be found collated in 29 Am. & Eng. Enc. Law (2d Ed.), p. 32. That is, that a landowner who maintains upon his own premises, for his own purposes, that which is alluring or tempting to little children, is held to a duty of exercising care with respect to their safety, in anticipation of the probability that they may be tempted to make use of his property for purposes of play. This doctrine has been repudiated in this State by the cases of *Turess* v. *Railroad Co.*, 61 N. J. Law, 314, decided by the supreme court, and *Delaware, etc., R. Co.* v. *Reich*, 61 N. J. Law, 635 (41 L. R. A. 831), decided by this court. The rule laid down in these cases is, as we think, wholly inconsistent with the asserted liability of the present defendant. That rule draws a clear distinction between temptation and invitation, and is to the effect that those who enter upon private property for their own purposes without invitation, but as trespassers or licensees, do so at their own peril, so far as any right on their part to call for active care on the part of the property owner for their welfare is concerned, and that although the injured party be an infant of tender years, and for that reason less able to care for its own safety, and more susceptible to the attractions that private property affords for purposes of play, this circumstance does not create a duty where none otherwise would exist. It is true that in our *Turntable Cases* the attractive objects were not within the limits of the public highway, but it is likewise true that in the present case, as already pointed out, while the building materials were within the street, they were deposited there, as private property, for lawful purposes by the defendant, in the exercise of the landowner's rights in that behalf. And although the representatives of the public might complain of the occupancy of a portion of the street by building materials if unreasonably prolonged, or if the materials were insecurely placed, and although any one lawfully using the street as such might have an action if specially injured by collision with the materials, or by their fall, if they were negligently left in an insecure position, we cannot see that these circumstances confer rights upon one who is using the building materials as the injured child in the present case was doing."

Of *Hughes* v. *Macfie*, 2 Hurlst. & C. 744, it is said:

" Defendants were occupants of a warehouse adjoining the street, with a cellar opening in the street, protected

by a wooden lid. Their workmen, in order to lower casks into the cellar, had raised the lid and rested it against the wall, nearly upright. One of the plaintiffs, a child of seven years of age, was playing in the street with other children, when the other plaintiff, a child of five, climbed upon the lid, and in jumping down pulled it over, to the injury of the two plaintiffs. The court denied the right of recovery to the child who had caused the lid to fall. Chief Baron Pollock saying:

"'We think the fact of the plaintiff being of tender years makes no difference. His touching the flap was for no lawful purpose, and if he could maintain the action he could equally do so if the flap had been placed inside defendant's premises within sight and reach of the child. As far as the child's act is concerned, he had no more right to touch this flap for the purpose for which he did touch it than he would have had if it had been inside of the defendant's premises. Cases were referred to, supposed to be in favor of the plaintiff. We think none are decisive of this case, and no case establishes a principle opposed to our view, which is that the nonsuit was right.'

"As to the other action, in which Abbott was plaintiff, it was held that if he was playing with Hughes, so as to be a joint actor with him, he could not maintain his action; but if not, he could, as his injuries would then be the result of the joint negligence of Hughes and the defendant. In the argument *Lynch* v. *Nurdin* was cited as express authority that in the case of an infant of tender years the circumstance that he was a trespasser and contributed to the mischief by his own act, will not necessarily preclude the maintenance of the action, and it was attempted to be shown that the authority of that case stood unimpeached by later decisions. Chief Baron Pollock made no more specific reference to *Lynch* v. *Nurdin* than is above quoted, but the present decision was manifestly inconsistent therewith."

We are of the opinion that it cannot be denied that these boys were trespassers when they climbed on this wagon as an adult would have been, and that the one who applied the match, at least, is liable for any damage he may have done to the gas company. It seems incongruous that he should at the same time have a cause of action for damages against the gas company for not preventing his

trespass. Such a right must rest upon the presence of some element that exempts a trespasser from the general rule that he cannot recover. Wanton or willful negligence, such as misconduct after discovered negligence or danger, might be sufficient, as we have already said, but we know of no other exception but that established in the *O'Leary Case*, if that should be so considered, which does not cover this case, as it *was expressly made to turn* upon the act of the owner in setting dangerous machinery in motion in the highway and leaving it with knowledge that children were present and had been meddling with it. This case was wanting in the particular upon which the *O'Leary Case* was rested. Mr. Justice BLAIR said:

"Plaintiff's mere technical trespass [a trespass nevertheless] did not set in motion, as in the cases cited, the agencies which caused his injury. Those agencies were brought into operation and controlled by defendant's employés. There is reasonable ground for distinction between a case where something is left in the highway which can only injure a child by his meddling with it and putting it into operation in the absence of the owner or person having it in charge, and a case like the present, where the owner is present operating the apparatus and has actual notice that the children are attracted by the tackle and will play with it unless prevented."

And it is said that the testimony showed that there was discovered negligence in that case, a witness testifying that he saw the children "on the rope," thus raising the question of discovered negligence under circumstances which in the opinion of a majority of the court made a question for the jury.

To hold that the defendant is liable in the present case is, in our opinion, either to "disregard the danger of confounding legal obligations with those sentiments which are independent of the law, which rests (as Judge CAMPBELL said) merely on grounds of feeling or moral considerations," *Hargreaves* v. *Deacon*, 25 Mich. 3, or to say that while these should not be disregarded in a case where

the trespass is on land, they should be where the trespass is upon personal property. Everyone must take some chances of injury in life, or mankind must assume the burden of looking after his fellows to the exclusion of himself, to the extent of anticipating and guarding against all sorts of unlawful intermeddling. Parents have the duty primarily of looking after children, and society has a right to expect that it will be performed and to act accordingly.

The judgment should be reversed, and no new trial ordered.

GRANT, J., concurred with HOOKER, J.

BLAIR, J. I concur, for the reason that in my opinion this case is ruled by *Kaumeier* v. *Railway Co.*, 116 Mich. 306 (40 L. R. A. 385).